**MACDONALD et al. v. WINFIELD CORP. et al.**

**No. 10393.**

United States Court of Appeals
Third Circuit.

Argued April 17, 1951.

Filed Aug. 9, 1951.

Rehearing Denied Oct. 8, 1951.

Owen B. Rhoads, Philadelphia, Pa. (Arthur E. Newbold, III, Philadelphia, Pa., Barnes, Dechert, Price, Myers & Clark, Philadelphia, Pa., on the brief), for appellant.

Robert L. Wright, Washington, D. C. (Henry Temin, Philadelphia, Pa., Milton M. Gottesman and Posner, Berge, Fox & Arent, all of Washington, D. C., on the brief), for appellee.

Before McLAUGHLIN, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

The litigants, Angus Snead Macdonald Corporation and Virginia Metal Products Corporation are competitors in the business of selling, engineering, fabricating, and installing library equipment. The Macdonald Corporation, and its president, Angus Snead Macdonald,[1] the plaintiffs herein, contend that Virginia Metal Products is unfairly competing with Macdonald Corporation in the library equipment market, and that Virgina Metal Products and the Winfield Corporation, its parent, have breached a contract which Winfield's predecessor[2] made with Angus Macdonald. The controversy is of federal cognizance under diversity jurisdiction. The district court, sitting without a jury found for the plaintiffs and awarded compensatory damages in the amount of $80,000, and an additional $80,000 exemplary damages. Defendants appealed.

In August, 1946, just prior to the execution of the agreement in suit, Angus Snead Macdonald controlled Snead & Company, which had fabricated various steel products under the Snead name and control for nearly 100 years. At this time from 15% to 30% of the Snead business appears to have been library equipment business, a specialized activity in which the company had engaged in some degree for some 40 years. However, the greater portion of the business was the general manufacture of metal partitions.

Snead & Company had been in serious financial difficulty. Negotiations for its reorganization and rehabilitation culminated in a contract dated August 9, 1946, by which the defendant, Winfield Corporation, agreed to purchase the outstanding common stock of Snead, and to convey to plaintiff, Angus Snead Macdonald and his contemplated new organization certain assets and rights pertaining to the library business. The charge of unfair competition grows principally out of conflicting claims by the competing companies as to the meaning of this agreement. For convenience we shall designate the interests defending this suit, which have successively been Phoenix, Winfield and Virginia Metal Products, as the old enterprise, and the complaining Macdonald interests, corporate and individual, as the new enterprise.

The central issue of the case is the nature and extent of the rights in the library business of Snead & Company which under this contract were conveyed to Macdonald for the new enterprise. Plaintiffs contend that the agreement contemplated the transfer of the entire Snead library equipment business. They maintain that the old enterprise, in violation of this obligation, has hampered plaintiffs' efforts to establish the new enterprise in the library equipment business, and that the old enterprise has entered into unfair competition with the new by false, unfair and malicious representations of the relationships of the two enterprises to the original Snead business.

In particular, plaintiffs contend that representations were made to the trade by the old enterprise that the new enterprise was merely its sales outlet and had no right to engage in the library equipment business under the Snead name. In addition, it is asserted that since the 1946 agreement the old enterprise has represented itself as formerly Snead & Company in an effort to obtain library equipment contracts in competition with the new enterprise. Moreover, plaintiffs contend that the old enterprise has refused to turn over tooling and patents as promised thus hampering efforts

---

1. Angus Snead Macdonald is a plaintiff here in two capacities: individually, and as trustee under a voting trust agreement.

2. The contract between the parties was signed for defendants by the Phoenix Iron Company. Its name has since been changed to the Winfield Corporation. There is no need for the purposes of this opinion to distinguish between them.

of the new enterprise to establish itself in the library equipment business, and laying the foundation for unfair claims publicly made by the old enterprise that it owned all of the valuable patents and tooling which Snead ever had.

Defendants' basic contention, on the other hand, is that the contract contemplated merely that the new enterprise should act as a sales agent for the old, which alone was to remain the principal in the library equipment business. Consequently, none of the detailed conduct could have damaged the plaintiffs. In addittition, defendants claim that they were to assign "patent rights", not patents; and that the old enterprise always told the truth when it said it was "formerly Snead & Co." and stated the facts about its relationship to the new enterprise.

To resolve this dispute we turn to the agreement itself as made between Macdonald and the old enterprise. It was in the form of an offer by the latter outlining the respective rights and responsibilities of the parties in the event they shall go forward with a scheme of reorganization. The pertinent provisions read as follows:

"(14) * * * In the event the undersigned should purchase the said common stock it is agreed with Angus S. Macdonald * * * as follows:

"(a) Whereas, there now exist on the books of Snead & Company contracts calling for the production, delivery, and or erection of products pertaining to library equipment and certain products of a type known as modular construction as covered by patent rights applicable thereto; and, whereas some or all of the present stockholders of Snead & Company are desirous of continuing to be engaged in the sale of such products, it is agreed that Angus S. Macdonald, Trustee, shall have the right to organize a corporation for this purpose within sixty (60) days from the date of purchase and the undersigned will undertake to assign to the new company said contracts and patent rights applicable to said products pertaining to library equipment and to said modular construction and the undersigned will endeavor to manu-facture the required equipment and materials for its account and will use its best endeavors to produce such products for the new company.

"(b) That the undersigned will produce the product known as metal planks exclusively for the said new company provided, however, that if the volume of orders received from the said new company is not adequate, in the undersigned's opinion, to fully occupy the equipment assigned by the undersigned for that purpose, the undersigned reserves the right to sell metal planks through *its own* sales organization. If on the other hand the undersigned is unable to fill orders received from said new company for such metal planks, or if the undersigned does not produce such metal planks for sale at a competitive price, then said new company shall have the right to obtain the production of such metal planks by other manufacturers and to sell the planks so produced, including the right to use applicable patents in connection therewith. (Italics added.)

"(c) That as soon as the undersigned changes the name of the corporation, the said Angus S. Macdonald, Trustee, shall have the right to use the name 'Snead' or 'Snead & Company'.

"(e) That the said Angus S. Macdonald, Trustee, shall have the right to purchase any or all special tooling, patterns, models, and samples used exclusively in the manufacture and sale of library equipment, modular construction and vending machines and not suitable for use in the manufacture of any other products of Snead & Company, at its book value, if any, as shown on the books of Snead & Company at any time within sixty (60) days from date of purchase of said stock; any special tooling, patterns, models and samples so purchased shall be removed by the purchaser from the premises of Snead & Company within ninety (90) days after request by Snead & Company.

"All work done by the undersigned for Angus S. Macdonald, Trustee, or his assigns, under the foregoing provisions shall be paid for at cost plus a percentage of profit to be agreed upon between the par-

ties from time to time. Credit arrangements must be made satisfactory to the undersigned.

"(f) That said Angus S. Macdonald, Trustee, shall have the exclusive right to continue and renew existing production and sales arrangements for partitions, and to make similar new arrangements, in all parts of the world, excepting only the United States, its Territories, Possessions, and Canada (the rights in which are reserved to Snead & Company) and to collect and retain all fees, commissions and other emoluments appertaining thereto."

We agree with the conclusion reached by the district court that under the terms of this agreement, Macdonald was authorized to form a new corporation, to enter it into the library equipment business as a principal acting solely in its own interest, and at appropriate time, to use the Snead name in that business. We are not persuaded by the opposing argument which is based principally on certain language of paragraph 14(a) of the contract. That paragraph, denuded as defendants suggest to make their point and with defendants' emphasis, reads as follows: "Whereas there * * * exist * * * contracts calling for the production, delivery and/or erection of products pertaining to library equipment * * *; and, whereas some or all of the present stockholders of Snead & Company are desirous of continuing to be engaged in the *sale* of such products, it is agreed that * * * [plaintiff] Macdonald * * * shall have the right to organize a corporation *for this purpose* * * *"

The inference drawn is that Macdonald was to set up a sales agency and only that. We consider this argument with care because it is central to defendants' case. Examination of the sentence indicates that it is the word "sale" which is crucial to the argument. Standing alone, there is no question that the word "sale" does not connote engineering, design or installation. But no principle of contract law requires or even permits us to take the word out of context. We have here a context that strongly suggests that the word "sale" was used broadly to comprehend design, production, and erection of library equipment.

The Snead library business consisted primarily of designing, fabricating and installing metal shelving, partitions, and related equipment in school and public libraries according to an established and characteristic system. The company repeatedly contracted for entire jobs of engineering, fabrication and installation. The 1946 agreement was obviously drafted in this context. It is unlikely that parties would bargain as they did for the assignment of "contracts calling for the production, delivery, and/or erection of" library products if Macdonald were to be merely a sales agency for defendant. It is unlikely that patent rights would be assigned to a sales agent. It is unlikely that the old enterprise would refer as it did in paragraph 14(b) of the proposal to "its own sales organization" distinct from the new enterprise if the latter were to occupy that status. It is unlikely that toolings "used exclusively in the manufacture or sale of library equipment * * *" would be transferred to a sales agency.

It is also noteworthy that Paragraph 14 (f) of the 1946 agreement which follows the undertakings concerning the library equipment business, specifically divides the general business of producing and selling partitions—as distinguished from the library business—between the parties, with the old enterprise reserving to itself the domestic market in this field. There was occasion for this division only if the new enterprise was viewed as something quite different from a sales agent for the old. The same inference may be drawn from the defendants' undertaking to use its best efforts to manufacture for the new company, while the latter was given considerable leeway in purchasing from other manufacturers.

Beyond all this, whatever room for doubt might otherwise exist as to the essential character of the 1946 contract is removed by the contemporaneous construction of it by the defendants, quite different from their subsequent view after they undertook to compete with the new enterprise for the library equipment business. On September

16, 1946, a representative of the old enterprise wrote to one of the Snead customers whose executory contract for library equipment was to be assigned to the new enterprise, under the August 1946 agreement as follows:

"* * * a new corporation known as the Angus Snead Macdonald Corporation has been organized for the purpose of selling, engineering, and erecting library stack equipment. Snead & Company proposes to assign the existing contracts concerning this phase of the business to the new corporation but will endeavor to manufacture for the new corporation the equipment necessary to fill its orders.

"We believe that this new arrangement will work to the advantage of the customer. The designing and engineering of book stacks will be done by the engineering staff of the new corporation under the direction of Mr. Angus Snead Macdonald and Col. W. M. Randall. This staff can now devote its time and skill to this purpose. The equipment to be manufactured at the plant of Snead & Company will be made by the same craftsmen who have been concerned with its fabrication through many years and under a management experienced in efficient manufacturing methods. The erection and installation will be accomplished under the supervision of the specialist engineers of the new corporation."

Again in December, 1946, a representative of the defendants advised an old customer of Snead:

"It is correct that Snead & Company are going out of the library business and have negotiated with the Angus Snead Macdonald Corporation, which is composed of former officials of Snead & Company, to take over the various library projects. We have made an agreement with the Angus Snead Macdonald Corporation, however, whereby they will do the complete engineering on all projects, furnish us with detailed shop drawings and we will do the fabrication. In this way you will have the benefit of the former engineering talent of Snead & Company who are now associated with the Angus Snead Macdonald Corporation, in addition to the various draftsmen

in the Snead & Company plant who were retained."

These are illustrative of a considerable number of rather similar statements properly considered by the district court. On the entire record we conclude that the district court was clearly right in its conclusion "that it was the intention and mutual understanding of the parties that Macdonald was to get the entire library 'business' (a term perfectly well understood by business men, whatever its exact legal meaning) and that the defendant would take a number of steps relating to the transfer of assets, in order to preserve the continuity of that business and to enable Macdonald to establish himself in the field".

■ We next deal with the right of Macdonald to use the Snead name. The 1946 contract provides that Macdonald shall have the right to use the name "Snead" or "Snead and Company". We regard this as a mutual effort to accomplish a transfer of business significance and value. When Macdonald was expressly authorized to carry on the library equipment business and to use the Snead name, we can only infer that defendants were not free to continue to use the name—at least in that business. Nor, if defendants should engage in that business, as they seem to have been free to do, is it reasonable to construe the contract as permitting them to represent themselves, in competition with the rightful successor to the Snead name, as the company which was formerly Snead and Company. Certainly the old enterprise was not free to refer to itself as formerly Snead suggesting at the same time that the new enterprise had no right to use that name. This whole line of conduct was the most obvious sharp practice to nullify a plain and fair bargain.

■ We can no more accept defendants' argument that it satisfied its contractual obligations to "assign patent rights" to the new company by offering licenses to Macdonald to use the library equipment patents held by Snead and Company and at the same time refusing to assign the patents themselves. We simply do not think that in the circumstances of this agreement "pa-

tent rights" meant less than full patent rights. The whole tenor of the contract was to provide Macdonald with whatever the old company had which would facilitate his establishment in the library equipment business. As the district court pointed out, the failure to assign patents made it possible for the old enterprise to assert—and often—that it was the owner of all the patents that Snead and Company ever had, all to the embarrassment of the new enterprise and its custom.

This consideration brings us to the question of damages which defendants claim are too speculative for judicial assessment. It is true that the nature of the unfair competition and the violations of contractual obligation by the old enterprise make it difficult to measure damage precisely and to identify particular injury as the proximate consequence of particular improper conduct. However, the general nature and substantial character of damage was clear. Business was lost, although it was frequently difficult to determine precisely the relative significance of various factors which in sum prevented the new enterprise from getting a particular contract won by a competitor. Nevertheless, in all the circumstances, we think that the conclusion reached by the district court was clearly within permissible bounds.

The parties competed not only with each other but also with other suppliers of library equipment. The plaintiffs adduced evidence tending to show that specific prospective customers were confused by representations of the old enterprise that it was the company which was formerly known as Snead, and that as a result the new enterprise was not awarded contracts which otherwise would in all probability have come to it. The plaintiffs also introduced evidence comparing awards of contracts made when the new enterprise bid on a job, and the old did not bid, with the awards made when both bid. These figures permit the inference that the competition of the old enterprise, the unfair incidents of which have already been outlined, was a factor in causing third persons to be preferred as bidders. Numerous examples appear in the record indicating the impact of the unfair competition but a few will suffice to show what happened.

Plaintiffs testified that the new enterprise made a bid for a $43,779 job at the Tennessee Polytechnic Institute. They offered in evidence a letter which indicates that the school was confused by the claims of both companies "to be manufacturers, and patent rights owners of the original Snead Book Stacks." The record further affords very substantial basis for inferring that a $218,000 bid on a job at the New York State Agricultural College was lost because of a misunderstanding about who Snead & Company was. On both this job and the Tennessee Polytechnic job, the new enterprise was the low bidder yet lost the business. In such circumstances, proof certain of what would have happened but for the defendants' wrong is not required.

Damage also seems to have resulted from a listing of the old enterprise in Sweet's Architectural File as Snead & Company. Obviously, it would be impossible to measure damage from this precisely. But that it was substantial could hardly be doubted. One specific example of this occurred in connection with the Southwestern Baptist Theological Seminary job. There was evidence that plans and specifications for use in formulating a bid were erroneously sent to the old enterprise as a result of the Sweet's listing. This job was worth $46,000. There is also basis for inferring that a job at the University of Michigan for $18,000 was lost because plans in connection with the job had been claimed from the Orange, Virginia postmaster by the old enterprise as a successor to Snead & Company. The fact that the old enterprise did not bid on either of these jobs does not foreclose its liability. Confusion caused by acts of the old enterprise and interference with plaintiffs' access to the market were hurtful factors.

The fact that there may have been other contributing causes of these and other losses is not enough to absolve the defendants from responsibility. The record shows that the statements by the old enterprise were widely distributed. For example, it ran an

advertisement in the American Library Association Bulletin in such a way as to suggest that Macdonald had nothing to do with the Snead system. Inability to measure exactly the damage done to Macdonald by this and similar statements does not preclude their consideration in the assessment of damages.

Overall the plaintiffs showed that they could have made gross profits of over $400,-000 on the library equipment contracts totalling somewhat over $1,500,000, which went to the old enterprise. The defendants contest the relevance of this figure on the ground that substantial expenses are ignored which must be taken into account before determining net gain, the only relevant item for the purpose of establishing damages. They point to plaintiffs' own figures which, even as to very recent years, show net income losses. But here precisely is where defendants' misconduct was hurtful. Only with large volume of business do administrative expenses of a considerable organization take on such modest proportion as makes for profit, and it was defendants' misconduct which diminished this volume. Plaintiffs do point to one period where their net profits bore a 10% ratio to sales. Such a ratio would represent $150,000 profit on sales which were made by the old enterprise. And this calculation takes no count of the large amount of business lost to other competitors.

▉▉▉▉ The nature of the problem and the evidence considered, we think the actual damages awarded in the amount of $80,000 were plainly within the wide area of discretion on the record before the trial court.[3] And, considering the patent wilfulness of defendants' conduct and its demonstrated serious impact on plaintiffs' business, we

find no basis for disagreeing with the assessment by the district court of punitive damages in the amount of $80,000.

The judgment of the district court will be affirmed.

---

3. The law of Virginia is controlling on the issue of damages. The defendants have cited cases which indicate that lost profits cannot be recovered where they are too speculative, and that normally they will be speculative where the business has never operated at a profit. Whitehead v. Cape Henry Syndicate, 1910, 111 Va. 193, 68 S.E. 263; Forbes v. Wyatt, 1925, 143 Va. 802, 129 S.E. 491; Sinclair Refining Co. v. Hamilton & Dotson, 1935, 164 Va. 203, 178 S.E. 777, 99 A.L.R. 929.

These cases do not deal with an appropriation by defendant of plaintiff's name, good will, patents and tools. It is this appropriation which permits plaintiffs to measure their damages in terms of defendants' profits. Moreover, as we have said, the district court's conclusion on damages was so far within the fair indicia of actual damage that under the Virginia cases it is clear that they were pro tanto not speculative.