**NORTHERN PETROCHEMICAL COM-
PANY, Plaintiff-Appellant,**

v.

**William F. TOMLINSON et al.,
Defendants-Appellees.**

**No. 72–1032.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 24, 1973.

Decided Aug. 28, 1973.

Charles J. Merriam, Edward M. O'Toole, Chicago, Ill., for plaintiff-appellant.

Kenneth J. Burns, Jr., Robert E. Pfaff, Chicago, Ill., for defendants-appellees.

Before SWYGERT, Chief Judge, DUFFY, Senior Circuit Judge, and STEVENS, Circuit Judge.

SWYGERT, Chief Judge.

Northern Petrochemical Company brought this diversity action against William F. Tomlinson, William A. Oswald and Surfact-Co., Inc., to obtain redress for their theft of trade secrets and other confidential information. As part of its relief, Northern moved for an injunction *pendente lite* restraining the defendants from use or disclosure of the stolen matter. This appeal was taken from the decision of the district court to deny injunctive relief prior to trial. Primarily at issue is whether the district judge was correct in his conclusion that Northern had failed to establish a likelihood that it would prevail upon a trial of the cause.

In early 1963 the Varney Chemical Company and the Culver Chemical Company Division of the Alberto-Culver Company separately began experimentation aimed at the development of a commercially feasible process for the manufacture of a tallow imidazolinium methosulfate, or TIM, fabric softener. Although Varney arrived at a moderately successful process by trial and error some two years later, it was not until early 1968 that Varney had developed an operation capable of producing a TIM type softener of sufficiently high quality to satisfy its most demanding customers. Culver was more successful. By the middle of 1966 it had developed a fully acceptable process of manufacture, apparently the only one in existence at the time. Northern now stands in the shoes of both Culver and Varney, having purchased the manufacturing assets, technical information, and inventory of each in 1970 and 1967, respectively. When, in 1970, Northern compared the newly-obtained Culver process with the process it had purchased from Varney, it allegedly discovered that the two were substantially identical.

Tomlinson and Surfact came into the picture as early as January, 1965, when Tomlinson, the president of Surfact, accepted an offer of a Herbert Frank to sell a commercial process for the manufacture of TIM type softener. Before his offer, Frank had been an employee of Culver. Northern complains that the process obtained from Frank is identical to that acquired by Northern by its purchase of Culver in 1970, and that the disclosure of Frank was in violation of a contractual obligation of silence he owed Culver.

Apparently not satisfied with the information he obtained from Frank, Tomlinson set about obtaining the services of Oswald in utilizing the Frank disclosure. Oswald had been a vice president of Varney and had been responsible for the production of TIM type softener by that firm. As a condition of his employment, Oswald had agreed not to disclose secret or confidential information of Varney nor to take employment with a business in substantial competition with Varney for two years after termination of his employment. When Northern acquired Varney, and after Oswald decided to stay on, he signed an agreement in which he reaffirmed these conditions as an employee of Northern. Nevertheless, Oswald accepted employment with Surfact as its vice president of manufacturing in December, 1970, and submitted to Northern at that time a letter of resignation, effective January 30, 1971. Since joining Surfact, Oswald has been engaged in the efforts of that firm to place a TIM type fabric softener on the market.

Despite all the efforts of Tomlinson, Surfact has not to date manufactured TIM type softener. Its ongoing effort to do so was greatly hampered by a recent explosion, which apparently placed Surfact back where it had started insofar as large-scale commercial manufacture of TIM type softener is concerned.

The instant lawsuit was filed in late 1971, after Tomlinson had announced to the trade that Surfact planned to manufacture and sell a TIM type softener in competition with Northern. The complaint sought relief in the form of a preliminary injunction restraining the defendants from receiving or disclosing confidential information belonging to Northern, from using the same confidential information in any manner, and from inducing the breach of Oswald's contractual obligations. A permanent injunction to the same effect was also sought, as were costs, damages, an accounting of profits, and the return to Northern of all documents bearing its confidential information.

Although the trial judge found that the process used by Northern in the manufacture of TIM type softener qualified as a trade secret under Illinois law, he denied the preliminary injunction largely because Northern had failed to establish a likelihood that it would prevail upon the merits of its case at trial. Northern, the judge thought, had shown no use or disclosure of its trade secrets

and had failed to prove a breach of contract on the part of Oswald. He also found that Northern was not in danger of irreparable injury. This appeal followed.

## II

Citing ILG Industries, Inc. v. Scott, 49 Ill.2d 88, 273 N.E.2d 393 (1971), Northern argues that Illinois law entitles it to an injunction restraining the defendants from the manufacture of a TIM type fabric softener for so long as it would have taken them independently to develop the secret process at issue by legal means. At oral argument, Northern conceded that this period would encompass no more than three to five years.

This contention is fraught with problems. Accepting Northern's argument that Surfact illegally acquired the Frank process early in 1965, it is apparent that more than five years had elapsed before Northern filed this lawsuit. More than eight years had elapsed by the time this appeal was argued. Whether Northern is now entitled to a lengthy restraint of Surfact is a troublesome aspect of this case. Moreover, we cannot be sure that Northern's claim dealing with disclosure by Oswald can stand separate and apart from its claim of disclosure by Frank. If Oswald knows no more than the Varney process, if the Varney and Culver processes are substantially identical, and if the process disclosed by Frank was in fact the Culver process, it follows that present disclosures by Oswald, if any, add nothing to the knowledge gained by Surfact from Frank in 1965 and do Northern no harm other than to stand as technical violations of its employment contract with Oswald. If, however, Oswald possesses knowledge in addition to the Varney process which qualifies as a trade secret of Northern or which Oswald is otherwise required by his employment contract to hold secret,[1] or if the Frank and Varney processes are substantially dissimilar, Northern may deserve an injunction even if Surfact is free to use the Frank process by virtue of the passage of time.[2]

Is Northern now possessed of the right to exclusive use of the Frank process for three to five years, when more than eight have passed since it was the victim of a presumably illegal acquisition of that process? At oral argument, counsel for Northern laid great stress on ILG Industries, Inc. v. Scott, 49 Ill.2d 88, 273 N.E.2d 393 (1971), as support for the proposition that the period of time for which a wrongdoer is to be restrained from the use of a trade secret is always equal to the period which would have been necessary to develop the secret by independent means, even if the thief has not employed the secret in

---

[1] His employment agreement with Northern requires that Oswald be silent about more than trade secrets. The agreement reads, in part:

I agree not to disclose at any time, either during or subsequent to my employment by Company, directly or indirectly, to anyone not an officer, or employee of Company, and not to use at any time, either during or subsequent to said employment, except in the course thereof, any information, knowledge or data of Company (whether or not developed by me) *which is not freely available to persons not employed by Company* unless the written consent of Company is first secured (emphasis supplied).

Thus, Oswald may have technical know-how and expertise relating to commercial implementation of the Varney process which, though not trade secrets, he has agreed not to disclose. The trial judge did not make a specific finding on this point.

[2] It makes no difference that the process Surfact intends to employ is, as the trial judge found, substantially "different" from the Frank process. In cases like this, the test of illegality is whether a supposedly different process contemplated for use was derived from a wrongfully obtained secret process. Restatement of Torts § 757, comment c, at 9 (1939) ; Forest Laboratories, Inc. v. Pillsbury Co., 452 F.2d 621 (7th Cir. 1971). We have no doubt that this describes the instant case; the evidence is clear that the process obtained from Frank in 1965 served as the cornerstone for any modified process which Surfact intends to use.

manufacture for a period of time equal to or greater than that required for an independent development of the secret.

We cannot accept this argument and conform to the rationale of *ILG*. Northern is correct in its notation that *ILG* approved an injunction the term of which was equivalent to the time necessary independently to arrive at the stolen secret. The same may be said of Schulenburg v. Signatrol, Inc., 33 Ill.2d 379, 212 N.E.2d 865 (1965), a landmark case in Illinois on the topic of trade secrets and a foundation case of *ILG*. Nevertheless, both cases are critically different from this one on their facts. In *ILG* and *Schulenburg*, secrets were stolen from the plaintiff firms by former employees, each group of whom immediately utilized the secrets to actively compete with their former employer. That is, a use of the secrets in commercial manufacture was undertaken directly after their theft. As undisputed testimony reveals, nothing of the sort occurred in this case. Surfact has never manufactured TIM type softener. After the explosion of its plant in 1972, Surfact stood as though it had just then acquired the trade secret insofar as its use for commercial manufacture was concerned.

Had Surfact put the Frank process into commercial use in 1965, and had Northern discovered the theft at that time and obtained an injunction against its use, Northern could have obtained a respite from competition by Surfact for no longer than the interval it has actually enjoyed by virtue of Sur-

fact's inactivity. In this connection, it bears repeating that a trade secret, unlike a patent or a copyright, has no proprietary dimension. A suit to redress the theft of a secret is one grounded in tort, with the act of theft comprising the misfeasance against which the law protects. And only in exceptional cases does the law of tort authorize a remedy which more than compensates a plaintiff for his loss. As *Schulenburg* made manifest, the theft of a trade secret is not such an exceptional case. In the words of the Illinois Supreme Court:

> The bothersome aspect of the trial and appellate court decisions is the scope of the injunction that has been issued. It does not restrict its application as to time or geographical area. Defendants have, in effect, been put out of business for all time, everywhere. This clearly is not *necessary to make plaintiffs whole* as it is conceded by them that their products may legally be copied by competitors. Since defendants might have reproduced plaintiffs' flasher in this fashion, it is difficult to justify prohibition of such reproduction for a period of time longer than that required to duplicate the product by lawful means. 33 Ill.2d at 388, 212 N.E.2d at 869 [3] (emphasis supplied).

In support of this compensatory attitude,[4] the *ILG* court noted that "[i]n many cases the question of whether a specific matter is a trade secret is an extremely close one, often not readily predictable until a court has announced its ruling." 49 Ill.2d at 97, 273 N.E.2d at 398. Moreover, the entity whose se-

---

3. This policy was emphatically reinforced in *ILG*:

"What in reality is protected in cases of this nature is not the product or process, but the secrecy of it. (Jones v. Ulrich, 342 Ill.App. 16, 30–32, 95 N.E.2d 113.) Contrary to the plaintiff's assertion, we believe commercial morality is preserved by preventing one from wrongfully using secret information for a period of time no longer than that required to discover or reproduce that information by lawful means. Where that period can be ascertained, the defendant should be put out of business only for that length of time and, thus, be prevented from obtaining any advantage by the wrongful use of trade secrets. Schulenburg v. Signatrol, Inc., 33 Ill.2d 379, 387, 388, 212 N.E.2d 865." 49 Ill.2d at 97–98, 273 N.E.2d at 398.

4. We should emphasize that our discussion of the compensatory stance of Illinois law is directed solely toward injunctive relief. What little authority exists on the topic of damages suggests that punitive or deterrent considerations may be taken into account when this form of relief is granted.

crets are stolen often may have a cause of action for exemplary or punitive damages against the persons who perpetrated the theft. Macdonald v. Winfield Corp., 191 F.2d 32, 38 (3rd Cir. 1951); R. Ellis, Trade Secrets, §§ 304–05 (1953). Finally, it is significant that Illinois independently provides a punitive sanction in its criminal statutes. Ill.Rev.Stats., Ch. 38, § 15–1 et seq.; see ILG Industries, Inc. v. Scott, 49 Ill.2d 88, 97, 273 N.E.2d 343, 348 (1971).

■ By the rationale of *Schulenburg* and *ILG*, Northern is as well compensated for the allegedly tortious activity of Frank and Tomlinson by having Surfact voluntarily abstain from competition as by having Surfact ordered to abstain therefrom, and this is true no matter what reason the tortfeasors may have had for failing to go into production.

The unwillingness of Northern to distinguish between cases where the thief uses the secret and cases where he does not has no logical foundation,[5] even if it is assumed that some punitive remedial element is permissible in correcting a theft of trade secrets in Illinois. In both cases the thief is equally guilty of his theft. Yet the one who is unable to make a speedy utilization of the fruits of his crime and who takes the chance or suffers the risk that his secret will become valueless in the wake of advancing technology is, by Northern's contention, made to suffer a far greater restriction than the thief who immediately goes into competition with the victim of the theft. We cannot condone this result. Nor are we persuaded by an argument that the thief who goes into immediate production confers upon his victim the benefit of an early notice that a theft of secrets has occurred. As Northern admits, chemical analysis of the end product in this case yields no information on the means by which it was produced.[6]

■ We conclude that Surfact is free to use the process which Tomlinson obtained from Frank, and that Northern has failed to show a likelihood that it will prevail at trial on its quest for an injunction against the use of that process by Tomlinson and Surfact. We are not sure, however, whether Oswald possesses confidential information—as defined by the law of trade secrets or by his employment contract—in addition to that disclosed by Frank. If Oswald does, authorities such as Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp., 255 F.Supp. 645 (E.D.Mich.1966), and B. F. Goodrich Co. v. Wohlgemuth, 117 Ohio App. 493, 192 N.E.2d 99 (1963), provide ample support to prevent him from working for Surfact in

---

5. It is instructive to note that the *Schulenburg* rule was vigorously attacked by ILG Industries in the *ILG* case on the ground that if the court "was correct in *Schulenburg* . . . the result is that the defendant Scott, by *biding his time*, becomes entitled to what he took." Brief for ILG Industries at 37 (emphasis supplied).

Two pages earlier, the brief is more emphatic still:

The Defendant Scott was not in the position of the general public. He accepted a higher obligation with respect to the information in question. To permit him to use that information . . . permits him to evade his trust *by simply waiting 18 months* [the period for independent discovery] (emphasis supplied).

Lastly, after *Schulenburg* was reaffirmed in *ILG*, counsel for ILG Industries argued as follows in support of a rehearing:

[T]he application of *Schulenburg* to the case of ILG v. Scott appears to authorize, for the future, the violation of trust *so long as the transgressor waits the required length of time.* It gives him the secret without the toil and expense; moreover, by relieving him of the duty of his trust, it gives him the power to destroy the secrecy, and thus also the law's protection of the secret (emphasis supplied).

ILG Industries, then, did not agree with Northern's present reading of *ILG* and *Schulenburg*.

6. Indeed, had the plaintiff in *Schulenburg* or *ILG* not known that the source of his competitor's information was the mouth of his former employee, we cannot imagine that a lawsuit would ever have been brought. This case is strikingly similar. Northern found out about the Frank transaction only after Oswald had gone to work for Surfact and discovery was undertaken in the resulting lawsuit.

aid of its competitive entry into the market for TIM type fabric softener.

The case is remanded to the district court for a finding on this point and the issuance of a preliminary injunction if appropriate. In all other respects, we affirm the decision of the district court.