412 So.2d 1164 (1982)
PLANHOUSE, INC. (Formerly The House of Plans, Inc.) and Jack B. Hughes
v.
BRELAND & FARMER DESIGNERS, INC. (Formerly The Plan Shop, Inc.).
No. 52972.
Supreme Court of Mississippi.
March 10, 1982.
Rehearing Denied March 31, 1982.
William P. Featherston, Jr., Jackson, for appellants.
Stephen Beach, III, Beach, Luckett, & Ross, Jackson, for appellee.
EN BANC.
WALKER, Justice, for the Court.
Planhouse, Inc. and Jack B. Hughes appeal from a final decree of the Chancery Court of the First Judicial District of Hinds County awarding the appellee, Breland & Farmer Designers, Inc., $21,503.95 in damages and permanently enjoining the defendants, Planhouse and Hughes from using residential house plans belonging to Breland & Farmer Designers, which had been wrongfully taken by Hughes.
*1165 The issues we address on this appeal are the propriety of the award of $21,503.95 damages, and the issuance of the injunction.
We reverse the award of $21,503.95 in damages, reverse and render on the issuance of a permanent injunction, and remand for a hearing by the chancellor to determine the amount of damages Breland & Farmer Designers is entitled to recover from Planhouse and Hughes in accordance with this opinion.
In 1973 Jack B. Hughes and wife of Edsel E. Breland formed The Plan Shop, Inc., a domestic close corporation which thereafter engaged in the business of designing and selling house plans. Breland and Hughes are residential designers.
Some time thereafter, the corporation employed John L. Farmer, an architectural designer. These three men later became equal shareholders in the corporation and each became an officer and director.
While each had specific business duties, all three had the common duty of designing and drafting house plans, which were marketed on a mass basis. The work product belonged to the corporation. Using statistical data, the corporation would learn which type houses had a mass appeal. Then, using the expertise of the three, plans would be drawn and advertised in a magazine or catalogue published by the corporation.
The procedure whereby plans were drawn and marketed was as follows: Each house plan initially was drawn upon a transparent paper called vellum. The plan would then be duplicated on a durable plastic material called mylar. Whenever the corporation received an order for a house plan, blueprints of the plan would be printed from the mylar. This process could be repeated almost endlessly, at least one thousand times without injury to the mylar. Blueprints of each house plan consisted of five to eight sheets.
The original vellum drawing could also be reproduced on a material called sepia, which was used in individual instances when a customer wanted to make some change in the plan. After duplication on the sepia of the portion of the plan upon which a change was desired, erasures could be made and the plan redrawn to the customer's specification. A blueprint could then be printed from the sepia the same as from mylar. Sepia lacked the durability of mylar, however, and would only be used in special cases.
The original plan, whether on vellum, mylar or sepia was retained and owned by the corporation. Customers received only the blueprints.
While an officer and director, Hughes duplicated approximately 74 of these plans from vellum onto sepia and stored them at his home. He stated at the trial his purpose in doing so was to protect the original plans in event of fire or other casualty. However, this duplication was done without the knowledge of the other two shareholders.
In May, 1977, two shareholders, Breland and Farmer, enforced a buy/sell agreement whereby any two shareholders could purchase the stock of the third at a stipulated price. Pursuant to a chancery court action Hughes was directed to sell his interest in the corporation for $5,000.00. Hughes thereupon sold his stock to the corporation in November, 1977, and severed all connection with the business. He retained all plans which he had theretofore duplicated on sepia and said nothing about it to the other shareholders.
There was no agreement not to compete between the shareholders, and shortly after the forced sale of his interest, Hughes formed a corporation named Planhouse, Inc., in which he was the sole shareholder. Beginning in March, 1978, Planhouse (Hughes), using the sepia plans duplicated onto mylar, published a magazine or catalogue which was distributed to the public and engaged in the same business as The Plan Shop. The plans advertised by Planhouse were the same as those advertised by The Plan Shop.
By using these sepia plans, Planhouse (Hughes) was able to begin business more quickly than would have been the case had he attempted to reproduce the plans from blueprints.
*1166 In taking the sepia copies of the house plans and duplicating them onto mylar, Planhouse (Hughes) saved time and expense in getting into business.
Upon seeing advertisements of Planhouse, The Plan Shop, which in the interim had changed its corporate name to Breland & Farmer Designers, Inc., instituted chancery court proceedings against Hughes and Planhouse for an injunction to prohibit Planhouse's use of the plans, an accounting and damages. The bill of complaint alleged, among other things, that Hughes had violated a fiduciary duty he owed the corporation in unlawfully copying the plans and using them in competition with Breland & Farmer Designers, after leaving the corporation.
Following trial in which it was stipulated Planhouse (Hughes) had realized a profit of $21,503.95 from sale of house plans, the chancellor ruled that Hughes had violated his fiduciary duty to the corporation in copying the plans onto sepia, and thereafter using them.
The chancellor permanently enjoined Planhouse and Hughes from any use of the plans taken from Breland & Farmer Designers, and awarded the complainant damages in the amount of $21,503.95.
The plans which Hughes had copied onto sepia while an officer and director of the corporation constituted property, which clearly belonged to Breland & Farmer Designers. They were made by him while employed by the corporation, with equipment belonging to the corporation, and on sepia belonging to the corporation. As such, the corporation had a clear property right to these sepia plans in the possession of Hughes and of the use which could be made of them.
While Hughes was an officer and director of the corporation, he occupied a trust relationship and owed a fiduciary duty to the corporation. American Empire Life Ins. Co. v. McAdory, 319 So.2d 237, 240-241 (Miss. 1975); Knox Glass Bottle Company v. Underwood, 228 Miss. 699, 89 So.2d 799 (1956). This duty carried with it the obligation to return the sepia plans in his possession which belonged to the corporation when he ceased having any business connection with the corporation. He violated this duty, and did not reveal to Breland & Farmer Designers that he had the plans. In Van Zandt v. Van Zandt, 227 Miss. 528, 538, 539, 86 So.2d 466, 470 (1956), we stated:
`[T]he relationship of principal and agent, being confidential and fiduciary in character; demands of the agent the utmost loyalty and good faith to his principal. Any breach of this good faith whereby the principal suffers any disadvantage and the agent reaps any benefit is a fraud for which the agent will be held accountable, either in damages or by judgment precluding the agent from taking or retaining the benefits so obtained.' (Emphasis theirs).
... .
`It is the prevailing rule that, as between persons sustaining a fiduciary or trust or other confidential relationship toward each other, the person occupying the relation of fiduciary or of confidence is under a duty to reveal the facts to the plaintiff (the other party), and that his silence when he ought to speak, or his failure to disclose what he ought to disclose, is as much a fraud at law as an actual affirmative false representation or act.'
Planhouse and Hughes argue on appeal that since the plans were neither confidential nor trade secrets they consequently had no value, and they therefore committed no wrong in using them in their business. It is true Hughes was free to engage in competition with his former associates, using the information, skill and knowledge he had acquired while thus associated with them.[1] *1167 However, although the ideas and information set forth on the plans did not constitute private property of the complainant, the reproduced physical sepia copies did. He had a fiduciary duty to deliver them to Breland & Farmer Designers when he ceased being an officer and director and having any business connection with the corporation. It is the violation of this duty for which Breland & Farmer Designers is entitled to redress. By violating the duty, Hughes was able to immediately reproduce the plans and offer the reproduced copies for sale to the general public. Without the sepia copies, it would have taken Hughes a considerable length of time to reproduce the same plans from a book of plans available on the market.
Planhouse (Hughes) began business in competition with the complainant, Breland & Farmer Designers, in March, 1978. The bill of complaint was filed June 5, 1979. Trial was begun October 24, 1980. There was a twenty-month lapse from the time the defendants (Planhouse and Hughes) began business until trial.
It is clear in this case that even if the defendants had wrongfully appropriated a trade secret from complainant, they could have secured for themselves the same position by lawful means, and without using the wrongfully appropriated plans, in far less time than twenty months.
The chancellor was in error in granting complainant a permanent injunction against defendants from use of the complainant's plans. Even where trade secrets have been wrongfully used by former employees, the majority rule, and one which courts generally apply, is the former employer is entitled to injunctive relief for no longer period than it would take the former employee to secure the same information or same position by independent means, and without resort to the trade secret. Anaconda Co. v. Metric Tool & Die Co., 485 F. Supp. 410 (D.Pa. 1980); Schulenburg v. Signatrol, Inc., 33 Ill.2d 379, 212 N.E.2d 865 (1965); Northern Petrochemical Co. v. Tomlinson, 484 F.2d 1057 (7th Cir.1973); K-2 Ski Co. v. Head Ski Co., Inc., 506 F.2d 471 (9th Cir.1974). Therefore, the permanent injunction is hereby dissolved.
A similar question to this case was presented in Midland-Ross Corporation v. Yokana, 185 F. Supp. 594 (D.N.J. 1960). In that case a former employee, Yokana, was charged with numerous violations of duties to his former employer, including taking with him drawings and blueprints, customer lists, cost calculations and pricing data. The district court declined to enjoin Yokana from engaging in business, but did direct the return of the documents he had taken, and an interlocutory appeal was taken by the plaintiff.
The district court was affirmed in Midland-Ross Corporation v. Yokana, 293 F.2d 411 (3rd Cir.1961). The court stated:
We have before us in this case two perfectly well established principles. One is that an employee after leaving the service of an employer may carry on the same business on his own and use for his own benefits the things he has learned while in the earlier employment. If this were not so an apprentice who has worked up through the stages of journeyman and master workman could never become an entrepreneur on his own behalf. Any such system of quasi-serfdom has long since passed away. Necessarily the former employee may use what he learned in the former employer's business while engaged in business for himself or some business competing with the former employer. All this is set out in the Restatement of Agency, Second, §§ 396 and 393, especially in comment e (1958).
Equally clear is the proposition that the employee owes a duty of loyalty to the employer. He must not, while employed, act contrary to the employer's interests, and, in general terms, owes a duty of loyalty as one of the incidents of the employer-employee relationship. Restatement *1168 of Agency, Second, § 387. These two general propositions are well settled and, in the broad terms just stated, could not be successfully disputed by anyone. The question is on which side of the line the present case falls.
The court of appeals then agreed with the lower court that there had been no trade secrets involved, and the documents taken by Yokana should be returned.
We can understand the chancellor's reasoning in this case in not directing a return of the plans wrongfully taken, which he had the authority to do, as was directed in Midland-Ross v. Yokana, supra. This directive in and of itself would have been of no benefit to complainant because the plans had been duplicated onto mylar, and there had been an irrevocable conversion of these plans by defendants to their own use.
We have carefully considered the record in this case and are of the opinion that the chancellor erred in assessing damages in the amount of profits realized by Hughes (Planhouse) from sale of the reproduced plans up until time of trial. This element of damages should have been fixed at the amount of profits made by Hughes (Planhouse) from the sale of the reproduced copies for the reasonable length of time that it would have taken for him to have reproduced the plans by independent means, which he had a right to do. Such would be the damages owing by him for breaching his fiduciary duty to The Plan Shop, Inc.
Since returning the plans to Breland & Farmer Designers by Hughes (Planhouse) would have been of no benefit to them under the facts of this case (they had additional prints of the plans on file), an additional element of allowable damages would be the reasonable market value of the sepia copies at the time and place of their conversion. Phillips Distributors, Inc. v. Texaco, Inc., 190 So.2d 840 (Miss. 1966); Ingram Day Lumber Co. v. Robertson, 129 Miss. 365, 92 So. 289 (1922); Masonite Corp. v. Williamson, 404 So.2d 565 (Miss. 1981).
For the foregoing reasons, the decree of the chancery court imposing a permanent injunction against Hughes (Planhouse) is reversed and the injunction is hereby dissolved. The decree assessing damages against Hughes (Planhouse) in the amount of $21,503.95 is also reversed and the cause is remanded to the chancery court on the question of damages alone to be fixed consistent with this opinion.
REVERSED AND RENDERED AS TO PERMANENT INJUNCTION; REVERSED AND REMANDED FOR NEW TRIAL AS TO DAMAGES ONLY.
PATTERSON, C.J., SMITH, SUGG, P. JJ., BROOM, ROY NOBLE LEE and BOWLING, JJ., concur.
HAWKINS and DAN M. LEE, JJ., dissent.
HAWKINS, Justice, dissenting in part:
I am in substantial agreement with the majority opinion.
Where the majority of my colleagues and I part company is my view that the chancellor was correct in awarding damages in the amount of profits the defendants admit they made from the wrongful use of the plans, namely: $21,503.95.
When a trustee wrongfully converts property of his beneficiary or principal to his own use, he should not in equity or good conscience be permitted to retain the profits realized from his wrongful use of such property. This is the general and elementary rule, and I see no reason to depart from it in this case.
Upon some basis, the rationality of which eludes me, the majority holds the trustee is only liable for the profits realized from a portion of the period he was wrongfully using the plans. The complainants had nothing to do with the length of time the defendants were using these plans; in fact, they filed a lawsuit to stop them. The defendants could have stopped at any time; in fact, had no business using them for any length of time, or at all.
*1169 As to the general rule that a trustee should be liable to the beneficiary for profits wrongfully obtained by conversion of the beneficiary's property to his own use, see Van Zandt v. Van Zandt, 227 Miss. 528, 86 So.2d 466 (1956), cited in the majority opinion, and Restatement of Restitution §§ 151, 157 (1937). Section 151, Comment "f" at 604 of the Restatement states:
A person who tortiously has acquired, retained or disposed of another's property with knowledge that such conduct is wrongful is entitled to no profits therefrom. Therefore, he is subject to liability at the election of the rightful owner for the value of anything received in exchange therefore. He is also liable for profits made by its use.
I wish the chancellor well in figuring the amount of the profits for "the reasonable length of time that it would have taken for him (Hughes) to have reproduced the plans by independent means."
I concur with the remainder of the majority opinion.
DAN M. LEE, J., joins in this dissent.
NOTES
[1] 2 Callmann, The Law of Unfair Competition Trademarks and Monopolies, § 54.2(a), p. 416 (3rd ed. 1968) states the general rule: "An employee, upon the termination of his employment, is free to draw upon his general knowledge, experience, memory and skill, howsoever gained, provided he does not use, disclose or impinge upon any of the secret processes or business secrets of his former employer. This rather piously oversimplified principle is much easier to state than to apply." (Emphasis ours). Suffice it to say from this record there was no showing of any information which would qualify as "secret" or "confidential" from an objective view, and the complainant makes no such contention on this appeal.