(No. 38849.—

EDWARD J. SCHULENBURG *et al.,* Appellees, *vs.* SIGNATROL, INC., *et al.,* Appellants.

*Opinion filed Sept. 28, 1965.—Rehearing denied Nov. 18, 1965.*

Gunn, Hickman and Kesler, of Danville, and Peterson, Lowry, Rall, Barber & Ross, of Chicago, (Horace E. Gunn, William R. Kesler, and Owen Rall, of counsel,) for appellants.

Acton, Baldwin, Bookwalter & Meyer, of Danville, (D. S. Baldwin, of counsel,) for appellees.

Mr. Justice Solfisburg delivered the opinion of the court:

This case involves the questions of trade secrets, unfair competition and injunctive relief. Plaintiff E-S Industries, Inc., successor to Time-O-Matic, manufactured and sold certain devices commonly called flashers and used primarily in the sign industry to cause lights to flash in such a manner as to animate the sign in various patterns or designs. The individual defendants were all former employees of said plaintiff who left to form their own competing company to manufacture and sell flashers. Plaintiffs filed suit against the defendants charging unfair competition by violation of a trade secret and requesting injunctive relief and damages. The trial court found the issues for the plaintiffs and issued an injunction restraining the defendants from the further manufacture and sale of competing flashers. The question of damages was postponed pending appeal. The appellate court affirmed (50 Ill. App. 2d 402), and we granted leave to appeal.

In 1932 the plaintiff Edward J. Schulenburg, Sr., went to work for Sangamo Electric Company at Springfield, Illinois, as head of its flasher and timer division and held that position until 1945 when he purchased all of the assets of the flasher and timer division for the sum of $2,718.61. However, this amount is unimportant for since that time

many blueprints, plans, specifications and drawings have been revised or added over the years by the plaintiff to perfect the flasher. In fact, there now are approximately 15,000 drawings of various types. He moved the operation to Danville, Illinois, under the name of Time-O-Matic Company. Defendant J. W. Sutphin had been an employee of Sangamo and when he returned from military service in 1945 he was employed by Time-O-Matic until January, 1959, when he and the plaintiff Schulenburg had a disagreement of policy concerning the operation of the company and he resigned. Signatrol, Inc. was organized by defendant Sutphin in March, 1959, to manufacture and sell flashers.

The defendant Bachman had been employed by Time-O-Matic since 1947, designing special equipment and assisting in sales work. Bachman left Time-O-Matic in the middle of March, 1959, after a disagreement with Schulenburg and joined the new corporation with Sutphin. The defendants McNamara and Walker had also been employees of Time-O-Matic for several years, McNamara as purchasing agent and Walker in the engineering department. Both of them asked Sutphin whether they could join his organization and in April, 1959, McNamara left Time-O-Matic and joined Signatrol as its purchasing agent and the following June, Walker also joined Signatrol.

The flashers produced by the plaintiffs are not patented nor is there any contention that the flasher itself or the method of assembling the flasher is a trade secret. Indeed, neither the plaintiffs nor defendants are true manufacturers, but actually buy the motors, gears, side plates, switches and other parts which they assemble. Many of these parts are regular catalogue items furnished by suppliers and can be ordered by anyone. For that matter, anyone may legally duplicate the plaintiffs' product and go into business in competition with the plaintiffs in the manufacture and sale of electric flashers.

Plaintiffs allege, however, that their manufacturing

"know-how" is a trade secret which was imparted in confidence to defendants while employees and that such secret has been used by them in manufacturing a competing product. Defendants deny utilization by them of any such secret, in fact they deny its very existence. The trial and appellate courts held that the information, measurements, designs and material specifications contained on plaintiffs' blueprints or drawings and used in the manufacturing process qualified as a trade secret. They further found that defendants copied or memorized the information contained on these blueprints and drew on such knowledge in making up their own blueprints to be used in the manufacture of their product.

The trial judge in his memorandum opinion stated the issues involved in the following language:

"Signatrol, Inc. was organized by the foregoing defendants in March 1959, and by the latter part of June, 1959, were (sic) engaged in the production of electric flashers. Their product was to serve the same purpose as plaintiff's (sic) product, and was very similar to the product of the plaintiffs. However, similarity of products is not the controlling test which is determinative of the issues in this case, but is a factor to be considered. The question of infringement of patents is not involved. The real question is whether or not the individual defendants, or some of them, either traced, copied or reproduced Time-O-Matic plans, drawings, prints, designs, or carried away in their minds information as to the same so that they could reproduce them from their memory, provided further that such information was such as would be classed as a 'trade secret'." The determinative question here is, how did the defendants go about reproducing the plaintiffs' flasher? Did they violate the confidence reposed by their employer by appropriating, in an unlawful manner, the trade secrets of the plaintiffs?

The trial judge has correctly stated the issues involved, and, of course, there is another issue in this appeal, and

that is whether the injunctive relief granted was appropriate.

The trial and the appellate courts concluded that the manufacturing "know-how" contained in the plaintiffs' blueprints and drawings were trade secrets in view of the fact that they were kept confidential and that plaintiffs considered such as secret and attempted reasonably to keep it so. The memorandum opinion of the trial judge is forty pages in length, contains a detailed analysis of the evidence, makes certain findings hereinafter mentioned, and contains a very competent analysis of most of the cases in the United States concerning trade secrets and the method whereby the use of such trade secrets is acquired either legally or illegally. The abstract of evidence is 240 pages in length, and it would unduly extend this opinion to review in detail all the evidence. Several of the more salient findings of the trial court are:

"The Defendants insist that they made their drawings directly from the parts themselves by measuring, except when they drew them from their memory of Time-O-Matic's drawings. However, their expert witness, Dale Beck, a skilled engineer, looked with considerable askance (sic) upon the ability of any engineer to make accurate drawings of many of the delicate parts merely by measurements of the parts. This was particularly true as to those parts where the measurements were to a 10/1000 of an inch. And to come up with the identical measurement, tolerances, etc., as appear upon Time-O-Matic drawings were (sic) almost impossible."

"There is a marked similarity between the drawings and sketches of Signatrol and those of Time-O-Matic, in other respects. The data is too often too alike to be just accidental. The placement of the data on the drawing is almost universally the same."

"The likenesses and similarities occur so often, with such exactness, that it seems most unlikely that they should

so occur, if, as claimed by defendants all their drawings were made from the torn down flasher parts, and without reference to any drawings or sketches or specifications of Time-O-Matic."

"It is to be observed that at no time did the Defendants seek to produce a new and improved flasher. They advanced no 'new novel' improvements. They only sought to reproduce the identical basic flasher of the Plaintiffs."

"From the character of the Defendants' own evidence, their admissions, the very nature of their procedure in entering into this competing business, their evasive attitude, one cannot but conclude that here was a carefully designed scheme and plan to reproduce from their employer's trade secrets, the product of their employer. This conclusion is emphasized by Sutphin's testimony that he anticipated he would be sued. He had sought the advice of an attorney, then anticipating a suit he preserved a large number of his sketches. Why would he anticipate being sued, if he only intended to copy the product from the product itself, and did not intend to resort to the use of his employer's trade secrets?"

"After hearing all the evidence, and having observed the Defendants as witnesses, and their manner of testifying, this Court is convinced that this was a well planned scheme upon the part of the Defendants. This Court believes that the very nature of all the occurrences confirms the testimony of Mrs. Bachman relative to copying Plaintiffs' plans, drawings and specifications in Bachman's home. This Court also believes that, just as the Defendants admit, they had over the years actually memorized Plaintiffs' plans and drawings, and the information upon them; that they actually had a mental picture of these trade secrets, which was no different than having a copy or picture on paper. These mental pictures were obtained while in Plaintiffs' employment, and to carry them away in this manner was a violation of a confidence reposed in them by their employer, as if they had

made copies or photographs and carried them away. This was not using the skill they had obtained, it was a question of copying and carrying away the actual trade secrets of Plaintiffs."

The trial judge also stated "it is of the very essence of things to see to it that the stringent and clamorous voice of self interest does not drown out the still, small voice of duty and conscience."

After having considered the entire record in the trial court, including the transcript of the evidence, and the trial judge's opinion, we have determined, as did the appellate court, that the evidence supported the findings of the trial court.

The controlling definition of a trade secret in Illinois is supplied by *Victor Chemical Works* v. *Iliff*, 299 Ill. 532, 540, where this court said that it is a secret *plan* or process, tool, mechanism or compound known only to its owner and those of his employees to whom it is necessary to confide it. The initial requirement that the plan, tool, *etc.*, be regarded as a secret has been found to exist by both the trial and appellate courts herein. There is ample evidence in the record to support these findings, and they should not be disturbed here. The more difficult question presented to this court is whether, notwithstanding the fact that the parties treated the information contained in the blueprints as containing confidential material, it nevertheless does not amount to a trade secret.

In *Smith* v. *Dravo Corp.* 203 F.2d 369, 7th cir. 1953, decided under the law of Pennsylvania and relied upon by both the trial and appellate courts herein, it was held that information contained in blueprints and patterns did qualify as a trade secret, even though the finished product was on the market (and could, as plaintiffs concede here, be copied by legal means), and literature had been distributed to the industry partially disclosing the product's design. The reasoning of that opinion is most persuasive here.

The defendants cite *Sears, Roebuck & Co. v. Stiffel,* 376 U.S. 225, 11 L. ed. 2d 661, 84 S. Ct. 784, and *Compco Corp. v. Day-Brite Lighting,* 376 U.S. 234, 11 L. ed. 2d 669, 84 S. Ct. 779, for the proposition "that no state may, by laws dealing with unfair competition, impose damages or enjoin the copying, manufacturing and sale of an article which is protected by neither a Federal patent nor a copyright." In a proper case, we would concur with this statement. However, a reading of *Sears* and *Compco* clearly indicates that they are inapposite here. There, the defendants had copied the plaintiffs' unpatentable products by legal means. No problem concerning trade secrets was present. Plaintiffs here readily concede that their finished products may be copied by legal means (such as acquiring one of the finished products and measuring and analyzing it, until a copy can be produced), but maintain that employees in positions of confidence may not surreptitiously copy plaintiffs' blueprints while in their employ and subsequently use them to establish a competing business. *Sears* has in fact been distinguished on this very basis, in *Servo Corporation of America v. General Electric Co.* (4th cir., 1964,) 337 F. 2d 716. It was there held that one could not take advantage of a confidential relationship and pirate another's trade secrets without responding in damages—even though the finished product was unpatentable and could be copied by legal means. It is readily apparent that the *Sears* and *Compco* cases do not cover a situation of industrial espionage by employees who plan to organize a competing company and thereafter do that very thing.

A holding that the confidential information contained in the blueprints does not constitute a trade secret would be incompatible with the practical problems inherent in attempting to copy a product from examination of the product itself. The measurements, tolerances, quality of material, *etc.,* cannot ordinarily be discovered by these means without expensive and time-consuming analyses. Plaintiffs have

gone through this process by trial and error and have preserved the information thus acquired in working drawings and blueprints. Defendants, however, have chosen to capitalize upon their positions of trust—to clandestinely acquire the blueprints and reproduce them exactly. There is evidence in the record indicating that when some of defendant's drawings are superimposed over plaintiffs' corresponding ones, they match exactly—even to the lettering thereon. Better evidence of copying would be hard to obtain. In fact, defendants have even copied some of plaintiffs' mistakes.

It is clear that an employee may take with him, at the termination of his employment, general skills and knowledge acquired during his tenure with the former employer. It is equally clear that the same employee may not take with him confidential particularized plans or processes developed by his employer and disclosed to him while the employer-employee relationship exists, which are unknown to others in the industry and which give the employer advantage over his competitors. The facts and circumstances in a particular case sometimes necessitate the drawing of a fine line of distinction in determining which rule should properly apply. Suffice it to say that the facts and circumstances indicated herein fall well within the contemplation of the latter rule.

It should, moreover, make no difference whether the information contained in the blueprints, if it qualified as a trade secret (which in our judgment it does), has been pilfered by tracing the blueprints themselves, as some testimony herein indicates, or has been memorized by someone with a photographic memory, or has been committed to memory by constant exposure to the prints while in the employ of plaintiffs. This record is replete with evidence leading to but one conclusion: that these defendants have surreptitiously taken the particularized information contained in plaintiffs' blueprints and have employed it to establish a competing business. Even today's "morals of the market place" are more demanding than this, and should

not be relaxed by this court. The determinations of the trial and appellate courts on the trade secret question are affirmed.

The bothersome aspect of the trial and appellate court decisions is the scope of the injunction that has been issued. It does not restrict its application as to time or geographical area. Defendants have, in effect, been put out of business for all time, everywhere. This clearly is not necessary to make plaintiffs whole as it is conceded by them that their products may legally be copied by competitors. Since defendants might have reproduced plaintiffs' flasher in this fashion, it is difficult to justify prohibition of such reproduction for a period of time longer than that required to duplicate the product by lawful means. The record contains no indication of the time so required, but such fact should be readily ascertainable since a Minnesota firm apparently did legally copy plaintiffs' product. Accordingly, we believe that the injunction should have been limited in duration to the period of time reasonably required for defendants to legally produce such copies. Since the original injunction has been stayed pending the determination of this appeal, we believe that justice will be served upon remand by an order of the trial court ordering the enforcement of the original injunction pending a prompt determination of the period of time required for the reproduction of the flashers by lawful means. The injunction should then be modified to terminate upon the expiration of such time period.

The trial and appellate court determinations on the trade secret issue are affirmed and the cause is remanded to the trial court with instructions to consider the question of damages and modification of the injunction in accordance with the views expressed herein.

*Affirmed in part and reversed in part and remanded, with directions.*