MIDWEST MICRO MEDIA, INC., Plaintiff-Appellee, v. JOSEPH MACHOTKA, Defendant-Appellant.—(MICRO-SCAN, INC., Defendant.)

Second District   No. 79-182

Opinion filed September 25, 1979.

Lloyd E. Dyer, Jr., of Wheaton, and Michael J. Scalzo, of Shapiro & Kreisman, of Oak Brook, for appellant.

Wendell W. Clancy, of St. Charles, for appellee.

Mr. JUSTICE SEIDENFELD delivered the opinion of the court:

This interlocutory appeal from an order granting a preliminary injunction tests whether a salesman's knowledge, acquired during his former employment, of customers' degrees of acceptance of a scientific test product is entitled to protection as a trade secret in the absence of an express contract.

On March 16, 1979, the trial judge granted the request of the employer, Midwest Micro Media, Inc. (MIDWEST) for a preliminary injunction against the employee, Joseph Machotka, barring him from contacting a particular list of hospitals described as "potential or established customers" and from divulging the degree of acceptance of the Midwest product until after the 5th day of August, 1979.

The defendant, Joseph Machotka, contends that the preliminary injunction was improvidently issued and should be dissolved. Alternatively he argues that the scope of the injunction is overly broad in enjoining him from contacting actual or potential customers for a period of six months.

In December 1976, Machotka was hired by Midwest as its sales representative. Midwest was formed in June 1976 by Dr. Frank Carone,

its president, to sell and distribute throughout the midwest two products which are manufactured by Micro Media Systems, the parent corporation. The two products are described as the "MIC Test" and "Combo Plate." The products were described by Dr. Carone as a laboratory technique to determine whether certain microorganisms are susceptible or sensitive to antibiotics. He described it in terms of its advance over the "Kirby-Bauer" system of testing as it existed prior to 1976. *Kirby* is a technique in which a growth plate that has agar on it is streaked with a particular organism referred from a patient with an infection. Small paper disks are placed on top of the plate. These are impregnated with antibiotics in various concentrations and it is allowed to incubate overnight. The antibiotic device goes into the agar and the microorganisms sensitive to it. The antibiotic will impair the growth of the bacteria. When the bacteria grows, it forms a cloud over the plate. If there is a clear zone around the disk it means that the growth has been impaired; the larger the disk the more sensitive the microorganism is to the particular antibiotic. These are measured, referred to various tables to determine how the test will be read, and read out as either susceptible, intermediate, or resistant.

Dr. Carone contrasted that with the MIC system, which he described as a different concept and "one order of magnitude better in terms of the type of data it can give the physician." In the MIC, an antibiotic is diluted serially twofold. Precise concentrations of the antibiotic in the growth media are known. An equal number of microorganisms is placed in each tube. It is incubated. Then the smallest concentration that impairs the growth of the organism is the MIC. This is the minimal inhibitor concentration which "gives the clinician a precise quantitative end point." If he can achieve the level of impairment or more, Dr. Carone testified, the clinician is "assured to prevent the growth of the organism." He described it as a different concept than the Kirby system in that the data is recorded in a different way, the test is read in a different way, the data is interpreted in a different way and the "use of the physician is entirely different."

From December 1976 until September 1978, Machotka was plaintiff's only salesman. Prior to joining Midwest he had worked for Gibco Diagnostics selling microbiological supplies and research products. As a "diagnostic representative" for Gibco he contacted hospital laboratories and acquired knowledge of who was in charge of purchasing microbiological supplies at the various hospitals.

During his employment with Midwest Machotka was responsible for calling on the hospitals in a nine-State midwestern territory. He acquired the names of potential customers for Midwest products either from inquiries or from what he described as "normal canvassing," or he "knew

them" from his previous employment. Gibco, however, did not sell a MIC system. Defendant's primary objective was to persuade the hospitals to switch from the "Kirby-Bauer Method" to Midwest's MIC test. When he joined Midwest in December of 1976 it had one customer; when he left in February 1979 it had approximately 50 hospitals who were buying its product. Until September 1978, when another employee was hired and trained for demonstrations of the product, Machotka had all the information as to potential customers, but there was no written list.

Dr. Carone testified that he did not know the customers, but conceded that the information was available to him at the present time. Dr. Carone also testified that when Machotka came to work for Midwest he was trained for about a month by a microbiologist; that it was four to six months before Midwest sold its first product; and that a total expense "in the neighborhood of $150,000" largely consisted of expenses for marketing. The Doctor also identified a list (exhibit A) which represented the hospitals, clinics or laboratories contacted by Midwest for marketing purposes and which apparently was constructed for the trial from various notes which Machotka turned over. He described that the experience had been that from the time of initial contact to purchase there could be a period of working with a potential customer to persuade him to buy the product of "over a year, almost two years."

Some time in December 1978 or January 1979, Machotka apparently decided to leave Midwest and planned to work for Micro-Scan, which manufactured a product competitive with Midwest's MIC. There was evidence that in January of 1979 defendant called on several of Midwest's customers notifying them of his planned departure and requesting a chance to make a subsequent demonstration of his new product. On February 4, 1979, defendant left Midwest and began actually working for Micro-Scan. When he left Midwest, defendant turned over all his records and documents relating to plaintiff's customers to Dr. Carone.

Dr. Carone testified that since the time Machotka left they had lost only one account and that it had nothing to do with Machotka's leaving. When asked what particularized information Machotka had that Micro-Scan could not acquire by calling the various hospitals, Dr. Carone testified that in his opinion Machotka knew

"* * * the intimate status of every hospital that we have contacted, not only whether they are on the product, whether they are likely, whether they have rejected it. He would know who to call, who not to call. He could operate at a very high level of efficiency it appears to me."

Following the hearing, the trial court concluded that the "valuable factor" was the ability to persuade prospective customers to switch from the Kirby system into the MIC system; that the information gathered by

the defendant during his employment was a valuable property right entitled to protection; that there was a reasonable expectation of the plaintiff prevailing on the merits and that irreparable harm would be caused if the preliminary injunction were not to issue. He concluded that "lead time" in which the company could acquire any information regarding acceptance of the process would be approximately six months and therefore extended the preliminary injunction for that period. Plaintiff was ordered to post bond in the amount of $20,000. Defendant's motion to dissolve was denied and this appeal followed.

■■ As we recently noted:

> "The requirements for the issuance of a preliminary injunction are well settled. For such an injunction to issue, the plaintiff must establish: (1) that he possesses a certain and clearly ascertained right which needs protection; (2) that he will suffer irreparable injury without the protection of an injunction; (3) that there is no adequate remedy at law for his injuries; and (4) that he is likely to be successful on the merits. (*Bromberg v. Whitler* (1977), 57 Ill. App. 3d 152, 155, 372 N.E.2d 837, 840.)" *Crest Builders, Inc. v. Willow Falls Improvement Association* (1979), 74 Ill. App. 3d 420.

■■ We conclude that the plaintiff has not established his right to a preliminary injunction in compliance with these requirements. Defendant's knowledge of the customers' degrees of acceptance of the MIC test does not appear to us to be a certain and clearly ascertained right in the nature of a trade secret which needs protection.

■■ A trade secret must, of course, be defined in terms of the facts of a particular case; but has been generally stated to be

> "* * * a plan or process, tool, mechanism, compound, or informational data utilized by a person in his business operations and known only to him and such limited other persons to whom it may be necessary to confide it. *Schulenburg v. Signatrol, Inc.*, 33 Ill. 2d 379, 385; *Victor Chemical Works v. Iliff*, 299 Ill. 532, 545, 546.
>
> Obviously, a trade secret must relate to something held in secret or confidence, and it must relate to the operation of the particular trade or business. [Citations.]" (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 92.)

*ILG Industries, Inc.*, adopting the statement in the Restatement of Torts, notes the factors to be considered:

> " '(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort

or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.' Restatement of Torts, § 757, comment b, p. 6." (*ILG Industries, Inc.*, 49 Ill. 2d 88, 93.)

As further noticed in *ILG Industries, Inc.*:

"One who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience. These skills are valuable to such employee in the market place for his services. Restraints cannot be lightly placed upon his right to compete in the area of his greatest worth." *ILG Industries, Inc.*, 49 Ill. 2d 88, 93-94.

■■ This court has previously acknowledged that while "a customer list may qualify as a trade secret, in ascertaining whether it is entitled to merit the protection of trade secrets, one of the determining factors is the extent of measures taken by the owner to guard the secrecy of the information. (Restatement of Torts §757, comment (b) (1939).)" *McCann Construction Specialties Co. v. Bosman* (1977), 44 Ill. App. 3d 1020, 1023.

Here, there is no evidence that Midwest took any steps to insure that its lists of customers or potential customers in the process of "education" on the use of the product was kept in a secret or confidential manner. The employee in fact kept his own list in the form of various notes and memorandums, and no company list as such was maintained.

In *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 357, we noted that the success of a salesman depends largely upon "his personal friendships and the confidence inherent therein." The court concluded that a salesman cannot be enjoined from soliciting business from the customers of his prior employer in the absence of special circumstances, such as a restrictive covenant, fraudulent copying or removal of lists from a prior employer, or if the names are confidential and not subject to memory, not publicly listed or otherwise readily obtainable.

See also *Kalnitz v. Ion Exchange Products, Inc.* (1971), 2 Ill. App. 3d 158, 162. In *Kalnitz*, a salesman left his employment and entered into a competing business, calling on some of the same customers. The former employer sought an injunction claiming that plaintiff stole defendant's confidential customer price list containing pricing information. The salesman responded that he remembered the customers from his experience as a salesman, and that the pricing information was available from the customers. The trial court's denial of the injunction was affirmed. The reviewing court noted that there was no restrictive employment contract and that there was no evidence that plaintiff stole or surreptitiously copied the defendant's customer data.

■■ Here the facts indicated that there was no contract restricting defendant's competition with plaintiff. Although a contract is not

absolutely required, an injunction will not issue without a contract, absent a breach of confidence. (See *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 357.) Here it is undisputed that the customers' names and addresses by themselves were not a trade secret, since they were readily obtainable from public directories. Furthermore, the customer "list" did not even exist until one of plaintiff's employees created the list from defendant's notes and records in preparation for the litigation. Thus, there was no list to be surreptitiously copied since the information was part of defendant's own knowledge of the business and customers. Plaintiff argues that the trade secret is the plaintiff's knowledge of the customers' degrees of acceptance of the MIC test. However, that information was developed totally through defendant's own work efforts. Of course, Midwest contributed a product to sell and offered a marketing program which envisioned the salesman working with the hospital technicians and departments involved over extended periods of time. The fact that this was a developing business would not appear to impose unique responsibilities upon the salesman however. His knowledge of the individual customers is closely akin to his personal skills and abilities as a salesman and thus cannot be considered plaintiff's property. (See cases collected in Annot., 28 A.L.R.3d 7, §14 (1969).) Further, the knowledge of a particular customer's degree of acceptance of the MIC test could be easily obtained by telephoning the individual hospital. Information which is readily obtainable is not considered a trade secret. *Revcor, Inc. v. Fame, Inc.* (1967), 85 Ill. App. 2d 350, 358.

The cases cited by Midwest in support of its argument are distinguishable. In *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, the plaintiff had developed a manufacturing technique by investing considerable time and expense. The employee traced or memorized plaintiff's blueprints and then subsequently used them in a competing enterprise. It was the "confidential particularized plans or processes developed by his employer and disclosed to" the employee which were unknown to others in the industry which gave the advantage which justified the injunction. (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 387.) Here only "general skills and knowledge acquired during his tenure with the former employer," which *Schulenburg* held that the employee could take with him, and not technical plans and specifications are involved. *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 387.

In *Holsinger, Theis & Co. v. Holsinger* (1946), 329 Ill. App. 460, an insurance agent copied the agency's entire file of policyholders which was organized by expiration date. When the agent left with this information and formed his own business, the original agency secured an injunction on the basis that the particular list was a trade secret. Here there was no company list, the information was defendant's own personal knowledge

of the customer, and the information could be readily obtained by telephoning the customers. In *Holsinger* the list of policyholders would not, on the other hand, be readily obtainable except from the original agency.

In *Armour & Co. v. United American Food Processors* (1976), 37 Ill. App. 3d 132, Armour had developed at considerable time and expense a list of 1,000 preferred customers from a total of 43,000 natural customers. The list was kept under lock and key. The defendant, a general manager of the corporation, went to work for a competing firm and hired his former secretary who had compiled the preferred customer list. From memory, they recompiled a portion of the preferred customer list and began solicitation. In *Armour* the defendants were subject to an employment contract restricting their use of trade secrets. In addition, the evidence of confidentiality is much stronger than here, and, further, the list was compiled through the corporation's own expense and effort rather than through the employee's personal contact with the customers. In *Affiliated Hospital Products, Inc. v. Baldwin* (1978), 57 Ill. App. 3d 800, the defendant worked for the plaintiff corporation on a design for the construction of hypodermic needles. Defendant left and developed a competitive process. In designing the new process defendant used drawings which had taken plaintiff five years to develop. The defendant developed a better machine in eight to 10 weeks with evidence that he had either alone or with other employees developed the plaintiff's original design. While, as here, *Affiliated Hospital* involved the employees' own personal skills and efforts, they were not in relation to salesmanship but involved a scientific discovery which resulted in a tangible work product including blueprints, designs, plans and specifications. See also Annot., 28 A.L.R.3d 7, §17 (1969).

The judgment granting the preliminary injunction is therefore reversed and the cause remanded with directions to vacate the order granting the preliminary injunction and for such further proceedings as are consistent with this opinion.

Reversed and remanded.

NASH and LINDBERG, JJ., concur.