SMITH OIL CORPORATION *et al.*, Plaintiffs-Appellants and Cross-Appellees, *v.* VIKING CHEMICAL COMPANY *et al.*, Defendants-Appellees, Cross-Appellants.

Second District   No. 2—83—1097

Opinion filed August 30, 1984.

Curtis D. Worden and David K.A. Shair, both of Rockford, for appellants.

John D. Witcher, of Holmstrom & Green, and Michael K. Havrilesko, of Williams & McCarthy, both of Rockford, for appellees.

PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

On September 12, 1983, Rock Valley Oil & Chemical Company (Rock Valley) purchased the industrial lubricant business of Smith Oil Corporation (Smith), operating in Rockford. Three Smith employees, defendants Frank Giovingo, Richard Fedeli and Dennis Rinaldi, immediately left and were employed by a competitor, Viking Chemical Company (Viking). Rock Valley and Smith sought and were granted a

temporary restraining order, without a hearing, which was later dissolved. Subsequently, after a hearing, the trial court entered a preliminary injunction granting some of the relief requested by Rock Valley and Smith but denying other requested relief. The trial court also awarded the individual defendants damages of $3,402 and Viking damages of $2,889, for damages resulting from what it found to be a wrongfully issued temporary restraining order and its dissolution. Smith and Rock Valley appeal; Viking and the individual defendants cross-appeal.

I

The complaint for injunction alleged that the defendants possessed customer lists, customer orders, pricing information, cost information, sample formulas, product formulas, customer correspondence and other special customer information and that the material was taken from Smith without authorization. Rock Valley and Smith requested that defendants be restrained from calling upon or soliciting the sale of any product sold by Giovingo and Fedeli or worked on by Rinaldi, while employed by Smith; from calling upon any customer or former customer on Smith's customer list; from disclosing or using any information concerning Smith's customers; from disclosing or using any information concerning the cost, pricing, formula or any other information concerning any Smith product; and from producing any product using Smith's formulas.

We first consider the plaintiffs' contention that it was error to deny any part of the relief requested. The order granting the preliminary injunction first provided that Smith had failed to demonstrate any irreparable harm, since it had gone out of business, and denied it injunctive relief. There is no challenge to this portion of the order.

The order further provides that the defendants may use their general blending or chemistry skills or sales skills, "even if obtained or developed at Smith," and may develop formulas for blending industrial oil "from a source independent of the knowledge of the defendants, Giovingo, Fedeli, or Rinaldi, which knowledge was obtained on or before September 9, 1983"; and that the defendants may use individual items of information contained in Smith's supplier book or monthly sales report which they might happen independently to recall. Rock Valley and Smith question this part of the order, contending that information regarding customers, suppliers' prices, and costs collected over many years and at great expense and effort on the part of the employer is protectable as a trade secret without the distinction made by the court between information memorized and recalled.

At the outset it is important to distinguish between the protection afforded an employer who has entered an enforceable restrictive covenant with his employees, and that afforded in its absence. While an enforceable restrictive covenant may protect material not properly characterized as a trade secret (see *Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637 (customer lists and generalized knowledge protected)), absent a restrictive covenant, an employer's protection is narrower and, in this context, extends only to trade secrets.

■■ ■ There is no real dispute between the parties as to what may be entitled to protection under the law as a "trade secret." Generally, an employee whose employment has terminated may not take "confidential particularized plans or processes developed by his employer," but may take "general skills and knowledge acquired during his tenure with the former employer." (*Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 387; *Packard Instrument Co. v. Reich* (1980), 89 Ill. App. 3d 908, 916-17.) A trade secret must be defined in terms of the facts of a particular case, with the following factors to be considered: (1) the extent to which the information is known outside of the employer's business; (2) the extent to which information is known by employees and others involved in the business; (3) the extent of the measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and his competitors; (5) the effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. (*ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93; *Midwest Micro Media, Inc. v. Machotka* (1979), 76 Ill. App. 3d 698, 702-03.) It is recognized, as a general rule, that the right of an individual to follow and pursue a particular occupation for which he is best trained is a fundamental right and that one who has worked in a particular field cannot be compelled to erase from his mind all of the general skills, knowledge and expertise acquired through his experience. *ILG Industries, Inc. v. Scott* (1971), 49 Ill. 2d 88, 93.

■ First, we decide whether any of the disputed material is entitled to receive protection as a trade secret. Plaintiffs asserted a proprietary interest in the customers and sought to enjoin defendants from soliciting the sale of any product sold or worked on by defendants while employed by Smith, and from calling on any customer or former customer on Smith's customer list. The trial court found that the defendants Giovingo and Fedeli, through their employment with Smith, learned the names of many industrial oil or lubricant cus-

tomers and became familiar with many people to contact and with the names of those customers, but that the prior knowledge of customer needs, in and of itself, was not entitled to protection. We agree. An employer ordinarily has no proprietary interest in his customers, although he can protect confidential information by a reasonable restrictive covenant. (Compare *The Packaging House, Inc. v. Hoffman* (1983), 114 Ill. App. 3d 284, 286-87 (confidential information protected by restrictive covenant), with *Kalnitz v. Ion Exchange Products, Inc.* (1971), 2 Ill. App. 3d 158, 161 (no restrictive covenant to protect confidential information).) We note that in this case no restrictive covenant is involved.

■ The manifest weight of the evidence adduced at the hearing supports the conclusion that the customer sales reports were not trade secrets. There was evidence that the defendants did not need the plaintiffs' sales report because the customer would give the salesman the price he was paying previously in order to get a competitive price; that product and pricing information was routinely given out by Smith order clerks to customers over the phone; that the customer lists were not under lock and key and were available to any clerk or employee; that computer sales reports were not restricted as to access nor locked up; that the defendants knew who the major customers in the industry were from general experience and merely had to ask the customer to give him a copy of the blanket orders, price structure and names of the products he was buying in order to compete; and that customers commonly dealt with more than one supplier, depending on who made the best bid. While it is undisputed that knowing who the customers are and what their needs are is valuable business information, the trial court's conclusion that the salesman's knowledge comes under the category of general knowledge and not under the category of a protectable trade secret is supported by the manifest weight of the evidence. See *Hayden's Sport Center, Inc. v. Johnson* (1982), 109 Ill. App. 3d 1140, 1148-49.

*Tower Oil & Technology Co. v. Buckley* (1981), 99 Ill. App. 3d 637, relied upon by the plaintiffs, is distinguishable. In *Tower* an industrial lubricants manufacturer successfully enforced its restrictive covenant against ex-employees who left to work for a competitor. The court protected the employer's customer list and confidential customer information, not because they were trade secrets, but because they were covered by a reasonable, enforceable restrictive covenant. (99 Ill. App. 3d 637, 643-44.) That court also noted that the covenant restricted defendants from soliciting approximately 2.4% of the customers in the Chicago area, whereas here, the trial court found

defendants would be prevented from soliciting the entire Rockford area market. Furthermore, in *Tower* the market was shown to be stable, with low customer turnover, whereas here, the evidence showed customers dealt with more than one supplier.

■ Next, plaintiffs assert a proprietary interest in defendants' general knowledge and skills acquired at Smith and seek to enjoin their use in other employment. The manifest weight of the evidence adduced at the hearing supports the trial court's holding that the defendants cannot be prevented from using their general blending or chemistry skills or sales skills even if obtained or developed at Smith; nor prohibited from making use of individual items of sales information contained in customer lists or reports which they may happen to recall from their independent recollection. See *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 387; *Midwest Micro Media, Inc. v. Machotka* (1979), 76 Ill. App. 3d 698, 703.

■ Finally, plaintiffs assert a proprietary interest in formulas, to protect both exact duplications of Smith products and comparable or equivalent products. That portion of the trial court's judgment order which provides that the defendants are not enjoined from developing a comparable or equivalent product to that sold by Smith or from developing a formula from a source independent of their knowledge acquired at Smith, although from skills developed there, is also supported by the manifest weight of the evidence.

The "formulas" which the plaintiffs sought to protect were presumably contained in a book used at Smith and referred to as "Exhibit 13." While generally referred to in the evidence, the exhibit is not made a part of the record, to protect what the plaintiffs claimed were trade secrets. The book contained both Smith and Sun Oil Company (Sun) formulas.

It should be noted that prior to the sale Smith was a wholly owned subsidiary of Sun. Rock Valley purchased Smith's business and, as a condition of the sale, became an exclusive distributor of Sun industrial lubricants in the Rockford area, but Rock Valley is not Sun's wholly owned subsidiary and has no right to Sun formulas. It is clear that Rock Valley has no standing to protect Sun formulas.

Each witness testifying explained the formulas from a different point of view. The testimony appeared contradictory, with plaintiffs' expert, John Frick, a lubricant product manager at Sun, emphasizing that Sun keeps its formulas secret, and defendant's expert, J. Richard Roweton, a consultant to compounders and blenders, stating that "there aren't too many secrets" among the oil companies because there are "only so many things you can do." However, taken as a

whole, the evidence resolves the apparent contradiction, establishing two categories of product information.

The first category comprises formulas proper, compared to recipes by Rock Valley's president Schram. These formulas exactly specify the required base oil, the additives, their proportions, the order of and temperature for blending, and the proper type and duration of agitation. With such a formula, an experienced blender can produce the exact duplicate of the desired product quickly. Oil companies customarily closely guard their formulas because, though most companies produce equivalent products, their performance differs somewhat. At Smith, while some formulas yielded equivalents to generally available products, others yielded products specially designed to suit a particular customer's machine.

The second category comprises unguarded descriptions of products in varying degrees of specificity. From these descriptions an experienced blender can deduce the missing information and can produce a product equivalent to a sample or desired product in time which may vary from a week to six months. Lubricant producers distribute data sheets describing their products' characteristics. Cross-reference publications chart equivalent products produced by larger oil companies, but not smaller ones like Smith or Viking. The charts describe the products' characteristics, list equivalent competitive products, and compare their performance to government and machinery manufacturer's minimum requirements. Upon request, additive suppliers send a blender an analysis of a sample at no charge. The analysis includes a starting point formula which specifies, generically, the base oil, and indicates which of the supplier's additive in what proportions will yield a product equivalent to the sample. The blender must then experiment to produce a product equivalent to the sample to meet his customer's needs.

Applying the definition of trade secrets to the facts before us, it appears that the exact formulas are protectable trade secrets, but that the ability to produce suitable comparable equivalents is within a general technical knowledge and is not a protectable trade secret. This distinction was found by the trial court, and we conclude that it is supported by the evidence.

Thus, the trial court properly found that the defendants may develop particular formulas from the use of their own general blending or chemistry skills and may develop comparable or equivalent products even though the ability to do so is from general skills and general experience acquired at Smith. See *Schulenburg v. Signatrol, Inc.* (1965), 33 Ill. 2d 379, 387.

## II

In support of their cross-appeal, the defendants contend that no injunction should have been issued. They argue that the portion of the trial court's order which prohibits the defendant from using or disclosing any formula contained in the "Formula Book" (defendants' exhibit No. 13), from disclosing any "originals, copies, or permanent recordings" from the book listing suppliers (plaintiff's exhibit No. 25) or from a monthly sales report (plaintiffs' exhibit No. 14) or similar monthly sales reports, and from "accepting any bids, or soliciting any bids if the customer obtained an order" from Smith on or before September 9, 1983, has no support in the evidence.

The plaintiffs produced some evidence to show that records were missing from the individual defendants' offices at the time they left Smith's employ. However, there was no proof that any of the defendants actually took or possessed any such material. They specifically deny any taking. The trial court, in fact, concluded that the plaintiffs' evidence as to the contents of files said to be missing was "confusing," "contradictory," and that there was a "nominal effort" to locate the files. Giovingo, who had particular access to the files in question, testified that he did not take or copy any of the files relied on by the plaintiffs from the office. He testified that when he was advised of the imminent sale he suggested to his supervisors that if Rock Valley were not to get Sun formulas which Smith was using, the blue book containing the formulas should be shredded. His supervisor advised him that Rock Valley was not purchasing Sun formulas. Giovingo testified that the book in his possession was then shredded and he made no copies. This testimony was not controverted.

While it is apparent from the record that the trial court resolved the issue of whether any records were taken by the individual defendants in their favor, it nevertheless in its order enjoined the defendants from using them. This appears to us to be inconsistent and contrary to law.

■■ ■ An injunction is authorized only if the party seeking it has raised a fair question that, among other requirements, he possesses a certain and clearly ascertained right which needs protection and that he will suffer irreparable harm without the granting of an injunction. (*Midwest Micro Media, Inc. v. Machotka* (1979), 76 Ill. App. 3d 698, 702.) The requirement of the showing of imminent injury is not satisfied by proof of a speculative possibility of injury and "such relief will not be granted to allay unfounded fears or misapprehensions." (*Barco Manufacturing Co. v. Wright* (1956), 10 Ill. 2d 157, 166.) An insufficient showing of harm requires the reversal of an order granting an

injunction. *Plasti-Drum Corp. v. Ferrell* (1979), 70 Ill. App. 3d 441, 453.

■ We conclude that the evidence supports a finding that at least some Smith formulas were protectable trade secrets. There is no evidence, however, that the defendants have taken or possess this material, and any suggestion that they do is purely speculative.

■ As to the supplier book, monthly sales report and the master customer list, it was improper for the trial court to enjoin any original copies or permanent recordings of them since, as the court in fact found, there was also no evidence that they were taken by the defendants. It also appears from the evidence that none of these particular items qualify as protectable trade secrets, since the same information was readily available, was used by many different people in the Smith office and was not kept secret. See *Lincoln Towers Insurance Agency v. Farrell* (1981), 99 Ill. App. 3d 353, 358-59.

■ We also find no support for that portion of the injunctive order prohibiting defendants from accepting or soliciting bids if the customer obtained an order "from Smith on a specific matter on or before September 9, 1983." Of the orders plaintiffs indicate defendants filled improperly, only the order placed by Woodward Governor with Smith September 9, and filled on September 12 by Viking, shows some evidence that Smith may have lost an order to Viking. We find no other evidence in the record that the defendants had or threatened to accept an offer or solicit a specific order which had been placed with Smith prior to their leaving on September 9, 1983. There is evidence that several customers of Smith tried to place orders with Smith on September 9, but that Smith could not deliver on that day because of the changeover in ownership, and that Giovingo on Monday, September 12, supplied the order from Viking. There is no evidence of ongoing unfair activity. This evidence was insufficient to support the injunctive orders.

### III

■ ■ Finally, we conclude that the damages were properly awarded upon the dissolution of the temporary restraining order (TRO). The trial court entered the temporary restraining order on September 16, 1983, and dissolved it on September 26, 1983. The court found that the plaintiffs' *ex parte* request on September 16 was not supported by specific facts showing immediate and irreparable harm and thus that the defendants were wrongfully restrained since the TRO without notice and without bond was improperly issued. Plaintiffs argue that damages are due only where the TRO is not en-

tered in good faith and that where, as here, a preliminary injunction soon was entered granting the relief sought in the TRO, that the damages should not lie. However, the temporary injunction may still be wrongfully issued although the plaintiff thereafter prevails in his suit for an injunction. (See *Schien v. City of Virden* (1955), 5 Ill. 2d 494, 503.) As noted in *Schien*, damages based on the wrongful issue of a temporary injunction are determined by the dissolution of the temporary injunction before the resolution of the case on its merits. (5 Ill. 2d 494, 503.) Since there was an adjudication that the temporary restraining order had been wrongfully issued, damages were properly ordered. See *Stocker Hinge Manufacturing Co. v. Darnel Industries, Inc.* (1983), 94 Ill. 2d 535, 543-44.

That portion of the judgment of the circuit court of Winnebago County which denied certain injunctive relief sought by the plaintiffs is affirmed; that portion which granted certain other injunctive relief is reversed.

Affirmed in part, reversed in part.

LINDBERG and NASH, JJ., concur.