**GLENAYRE ELECTRONICS, LTD., Plaintiff,**

v.

**Joel SANDAHL, Individually, and Complex Systems, Inc., an Illinois Corporation, Defendants.**

No. 92–3070.

United States District Court, C.D. Illinois, Springfield Division.

Sept. 16, 1993.

Delmer R. Mitchell, Quincy, IL, F. Ross Boundy, Seattle, WA, for plaintiff.

Tyrone Fahner, Mayer, Brown & Platt, Chicago, IL, John H. Long, Springfield, IL, Michael Stolarski, Roger H. Dusberger, Schaumburg, IL, for defendants.

OPINION

RICHARD MILLS, District Judge:

A case of intellectual property.

The specific issue is whether trade secrets were misappropriated.

We conclude not.

## I.  BACKGROUND

In July of 1989, Glenayre Electronics, Ltd. (Glenayre) purchased Quintron Corporation (Quintron) located in Quincy, Illinois, which became known as Glenayre Quincy. Its primary function was the development and manufacture of paging systems. In fact, two years earlier, Quintron began negotiations with SimulComm Partnership (SimulComm) for the acquisition or license of technology related to paging systems known as SCS technology.

During the negotiations in August of 1988, Joel Sandahl, the managing director of SimulComm, left it and joined Quintron. After Mr. Sandahl arrived at Quintron, a final licensing agreement was executed whereby Quintron would be the exclusive licensee of the SimulComm system. In January of 1990, Mr. Sandahl left Quintron, along with two other engineers, and formed Complex Systems (Complex). For approximately the next six months, Mr. Sandahl, operating through Complex, continued to provide consulting services to Glenayre.

Meanwhile, Glenayre claims that it was independently developing a new paging system entitled "Omega Gold." The Omega Gold system includes valuable trade secrets which are Glenayre's exclusive property.

Consequently, it has determined that several patentable inventions are present in the Omega Gold system and is currently in the process of obtaining patent protection for them.

As part of this process, several technical documents, including patent applications, have been prepared by Glenayre's personnel and patent counsel. Glenayre maintains that it has not published or otherwise disseminated these documents or materials; nevertheless, it believes that Defendants obtained Glenayre's proprietary and trade secret information which they could use to acquire a competitive advantage.

In fact, Complex is developing a new paging system referred to as C–NET. At the time these proceedings were initiated, Complex's design of the C–NET system was the subject of an arbitration proceeding in Quincy, Illinois, between Glenayre and Complex regarding Complex's alleged violation of its noncompete agreement with Glenayre.

During a pre-trial hearing in relation to the arbitration proceedings, Mr. Sandahl stated that an attorney had examined both the Glenayre and C–NET patent applications and found that Glenayre's application was a "clone" of Complex's. It is this event that led Glenayre to the conclusion that Complex somehow obtained a copy of its confidential and proprietary information relating to Omega Gold.

On April 3, 1992, Glenayre filed a complaint: Count I alleges common law misappropriation of trade secrets; Count II asserts a claim for statutory misappropriation of trade secrets; and Count III alleges that Defendants tortiously interfered with contractual relations. The Court granted the motion for a preliminary injunction; however, it allowed both parties to continue to pursue patent applications on the technology at issue. On May 24, 1993, the parties stipulated to a dismissal of Counts I and III. This cause is before the Court on Defendants' *motion for summary judgment on Count II* of the complaint, pursuant to Fed. R.Civ.P. 56.

## II.  SUMMARY JUDGMENT

Under Fed.R.Civ.P. 56(c), summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Black v. Henry Pratt Co.*, 778 F.2d 1278, 1281 (7th Cir.1985). The moving party has the burden of providing proper documentary evidence to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Unquestionably, in determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial. *Howland v. Kilquist*, 833 F.2d 639 (7th Cir.1987). "A scintilla of evidence in support of the non-movant's position is insufficient to successfully oppose summary judgment; 'there must be evidence on which the jury could reasonably find for the [nonmoving party].'" *Brownell v. Figel*, 950 F.2d 1285 (7th Cir. 1991) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986)). Moreover, a party opposing a motion for summary judgment cannot merely point to "some circumstantial tidbits" showing that the moving party did the act on which the complaint is based; rather, it "must 'do more than show that there is some metaphysical doubt as to the material facts.'" *Price v. Rochford*, 947 F.2d 829 (7th Cir.1991) (quoting *Matsushita Elec. Industrial Co., Ltd v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

## III.  ANALYSIS

### A.  Defendants' Motion for Summary Judgment

Count II alleges that Defendants violated the Illinois Trade Secrets Act, 765 ILCS

1065. Defendants contend that they are entitled to summary judgment on this count because Glenayre has not produced any facts demonstrating that Defendants "had access to, let alone 'misappropriated', its alleged trade secrets." Rather, Glenayre has offered only "beliefs." Defendant's employees have denied knowledge of Omega Gold's trade secrets.

Glenayre asserts that there is sufficient circumstantial evidence showing the existence of genuine issues of material fact. With the summary judgment standard in mind, Glenayre requests that the Court also consider that in trade secret misappropriation cases:

> Plaintiffs ..., who must prove by a fair preponderance of the evidence disclosure to third parties and use of the trade secret by the third parties, are confronted with an extraordinarily difficult task. Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases, plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construct of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything.

*Greenberg v. Croydon Plastics Co.,* 378 F.Supp. 806, 814 (E.D.Pa.1974).

### 1. *Summary of submitted arguments and evidence*

The principals of Complex Systems, conceived of C–NET in April or May of 1990 and prepared brochures and displayed a minimally functioning model at a September 1990 trade show. C–NET was beta tested in March, 1991 and was ready to be installed or delivered at that time. Nearly six months later, Defendants had a brochure prepared in September 1991 describing C–NET Platinum and began beta testing on part of the unit some time later.

Glenayre states that Defendants' efficiency in developing the C–NET System was the result of their incorporation of certain technology which they had previously licensed to it. The Court notes that this matter is presently being arbitrated in Chicago.

Glenayre conceived of the Omega Gold system in September 1990. However, it was not due for a beta test or for the market place until a later date.

Basically, Glenayre claims that the 7 employees which left it for Complex must have supplied information appropriated from its trade secrets in order for it to develop the C–NET Platinum technology. Otherwise, Complex systems would not have been able to develop its paging technology so rapidly. Glenayre asserts that a review of the technical documents indicates that Defendants appear to have developed the technology at issue "out of thin air." Glenayre does not cite to any set of documents or records or provide any affidavits in support of this assertion.

Glenayre points to an incident involving its former employee, Joel Sandahl, which occurred while the parties were attending a pre-hearing conference for arbitration. During Complex's attorney's argument, Sandahl blurted out that he had an attorney review both the Omega Gold and C–NET patent applications and that the attorney had concluded that Omega Gold was a clone of C–NET. Sandahl identified the attorney that had reached that conclusion after declining to represent Sandahl due to a conflict of interest between him and Glenayre. However, Glenayre obtained an affidavit from that attorney stating that Glenayre was not his client, he had not previously heard the name "Glenayre" or its predecessor "Quintron", and he had never been shown a patent application from Glenayre.

Defendant states that Sandahl did send C–NET material to the attorney, who declined representation because he was prosecuting a similar patent application and therefore had a conflict of interest. Sandahl subsequently spoke to Glenayre's president, Jack Hurley, who informed him that Glenayre was developing Omega Gold which was equivalent to C–NET. Due to this revelation, Sandahl assumed that the attorney had declined rep-

resentation because he was processing Omega Gold's patent application. Consequently, Sandahl's comment during the arbitration procedure was the result of a misunderstanding, not misappropriation. Moreover, Sandahl denied having any knowledge, access to, or possession of Omega Gold information.

Also, Glenayre claims that Michael Tanner, one of its former employees had access to Omega Gold trade secrets, because he "was to be an integral part of the Omega Gold team." On January 16, 1991, Tanner accepted a higher paying position with Complex. However, he did not submit his resignation to Glenayre until five days later. Glenayre poses that this delay was for the purpose of Tanner learning as much as possible about Omega Gold. Glenayre also points to the fact that at Tanner's deposition, he initially testified that he had never heard of the Omega Gold project. Later, after examining a "to do list" he had prepared in December of 1990, he remembered that he had been assigned to perform some design work on the "brains" of the system. After remembering that, Tanner stated that he could not recall anything that he had done or seen regarding Omega Gold. Plaintiff maintains that Tanner's deposition testimony and the circumstances under which he left Glenayre imply that he took trade secrets regarding Omega Gold with him.

Defendants state that the first mention of the technology at issue appears in documents prepared months after Tanner's departure. Also, when Tanner left, Glenayre's vice-president sent him a letter stating that Glenayre believed that he had trade secrets which should be kept confidential. Tanner replied that he would respect the confidentiality of any valid trade secrets he possessed and requested that Glenayre identify such information which he possessed. Glenayre did not respond to this request.

The Court notes that the evidence Glenayre provided shows that Tanner was given a memo regarding the future development of Omega Gold Technology in September of 1990. However, Glenayre has not identified any trade secret regarding Omega Gold which Tanner worked on prior to his departure. Tanner's "to do list" was prepared merely one month prior to his departure. In fact, Plaintiff states:

"Tanner *was to be* an integral part of the Omega Gold team. In hindsight, including Tanner into the inner sanctum of Omega Gold would be a disastrous mistake."

In addition, Glenayre points to an illustration generated by Complex's employee, Steve Sandercock. The illustration has the words "Omega Gold" with the sign "don't or no" superimposed and, at the top of the page the phrase "Cloning Prohibited" while at the bottom appears "C–NET Platinum". Glenayre contends that a reasoned interpretation of this illustration "is that Complex had obtained Omega Gold information and Sandercock either believed that C–NET Platinum was a clone of Omega Gold" and that Defendants "had detailed knowledge of Omega Gold and concluded that C–NET Platinum was a 'clone' of Omega Gold."

Defendants contend that there is no evidence that Sandercock actually obtained trade secrets. Defendants point to the deposition of Glenayre's Rule 30(b)(6) designee, which states:

Q. Does Glenayre have any evidence suggesting that any person from Glenayre leaked information to Complex Systems?

A. I'm not aware of any such evidence.

Finally, Plaintiff asserts that Motorola has left a "smoking gun" in the form of a memorandum from one of its attorneys to Defendants. The memorandum discusses a draft of a proposed settlement agreement between Glenayre and Complex and expresses concerns over cloning products covered by trade secret protection. Glenayre argues that the memo shows that as early as October of 1991, Complex was concerned that C–NET Platinum's "cloning" of Omega Gold would be discovered and that Glenayre would file suit. The Court notes that Glenayre does not state which action(s) the settlement memorandum addressed. Therefore, pursuant to Fed. R.Evid. 408, the Court questions the admissibility of the memorandum.

### 2. *Law and analysis*

■ To demonstrate a misappropriation of trade secrets, the plaintiff must show that:

1) it has a trade secret; 2) the defendant obtained the secret while in a confidential relationship with the plaintiff; 3) the defendant disclosed the secret in breach of the confidential relationship; and 4) the defendant profited from the disclosure. *Etri v. Nippon Miniature Bearing Corp.*, 1989 WL 99575 (N.D.Ill. Aug. 18, 1989). Illinois courts have recognized that an employee whose employment has been terminated may not take " 'confidential and particularized plans or processes developed by the employer', but may take 'generalized skills and knowledge acquired during his tenure with the former employer.' " *Smith Oil Corp. v. Viking Chemical Co.*, 127 Ill.App.3d 423, 82 Ill.Dec. 250, 253, 468 N.E.2d 797, 800 (2d Dist.1984) (quoting *Schulenberg v. Signatrol, Inc.*, 33 Ill.2d 379, 212 N.E.2d 865 (1965)). One who has worked in a particular field cannot be forced to delete from his mind all of the knowledge and expertise gained through his or her experience. *Smith Oil Corp.*, 82 Ill. Dec. at 253, 468 N.E.2d at 800.

■ Accordingly, the question before the Court is whether Glenayre has provided sufficient evidence, from which the jury could reasonably find for it, that Defendants could not have developed the C–NET Platinum technology so quickly on their own after leaving Glenayre's employment, unless they misappropriated its trade secrets. The Court concludes that Plaintiff has not.

After examining the evidence in the light most favorable to Plaintiff, the Court finds that there is nothing, other than speculation and innuendo, indicating that Defendants had possession of Glenayre's trade secrets. Glenayre has not provided any direct evidence of misappropriation, and the circumstantial evidence provided is too thin a reed to withstand Defendants' motion. There is no doubt that the gentlemen who left Glenayre's employment are highly knowledgeable and experienced regarding paging system technology. These former employees were not required to leave their skills at Glenayre. Glenayre's evidence does not create a question of material fact as to whether Defendants' product development was the result of trade secret misappropriation instead of the result of the Defendants' own expertise and ingenuity.

*Ergo,* Defendants' motion for summary judgment on Count II is ALLOWED. Plaintiff's complaint is DISMISSED WITH PREJUDICE.

Case closed.